CHARLES CHEVALLIER vs. MATTHEW STRAHAM & THOMAS STRAHAM — Appeal from Nacogdoches County.

S. & S., whose principal business was that of farming, but who, a part of the time, and during the season for hauling, occasionally run their wagon, for hire, received certain bales of cotton which they undertook to haul to Nacogdoches. On the road some of the ropes broke, and the bales partially burst open. On the night the cotton was destroyed, the wagon was placed within fifteen feet of the camp fire, which was renewed at midnight, at which time no wind was blowing. The cotton was discovered to be on fire about daybreak and burning furiously. The wind had then arisen, and was blowing

the camp fire towards the cotton. This was in December. *Held*, that they were liable for the loss as common carriers. [10 Tex. 344; 14 Tex. 290; 17 Tex. 227; 18 Tex. 498.]

All persons who transport goods from place to place, for hire, for such persons as see fit to employ them, whether usually or occasionally, whether as a principal or an incidental and subordinate occupation, are common carriers, and incur all their responsibilities.

This was a suit brought by the appellant against the appellees, upon an alleged liability incurred by them as partners in the business and trade of common carriers.

The material facts are stated in the opinion of the court.

*Taylor* and *I. R. Lewis*, for appellant.

*Rusk* and *Henderson*, for appellees.

No briefs furnished the reporters.

Mr. Chief Justice HEMPHILL delivered the opinion of the court.

[116] The petition charges that the defendants, being partners in the business and trade of common carriers, for hire, from the town of Nacogdoches in Texas, to the town of Nachitoches in the state of Louisiana, received in that capacity, from the plaintiff, six bales of cotton, which they undertook to convey to Nachitoches for a reasonable reward, but failed to do so, and the cotton was wholly lost to the petitioner. There were three trials in the court below; in the first of which the jury could not agree on a verdict, and in the two latter found for the defendant.

We are are not informed by the record of the instructions given by the judge to the jury, nor are exceptions taken to the opinion of the court. The facts are, however, agreed upon, and from these we ascertain that the "defendants owned and run a wagon to haul cotton to and goods from Nacogdoches; that their principal business was farming, but a part of the time, and during the season for hauling, they run their wagon when they occasionally could get a chance;" that the cotton was received in good order; and that on the road some of the ropes broke, and the bales partially bursted open. On the night the cotton was destroyed, the wagon was placed within fifteen feet of the camp fire; the fire was renewed at midnight, but neither

at that time, nor when the teamsters first lay down, was there any wind; about the break of day the cotton was discovered to be on fire and burning furiously. The wind had then arisen and was blowing the camp fire towards the cotton; this occurred in the month of December.

The appellees contend: 1st. That they are not chargeable as common carriers; that they are bailees or carriers for hire in the particular case, and not having expressly assumed the risk of common carriers, they are liable only for losses occasioned by ordinary negligence; and

2d. That if regarded as common carriers, they insist that the destruction of the cotton was occasioned by an act of God, and that therefore they are not responsible for the loss.

The question, whether persons who pursue the business of [**117**] transporting goods for hire as only an occasional, and not as a principal occupation, are to be regarded as common carriers, and subject to their obligations and responsibilities, is one which, from the extensive interests involved, and the number of persons so engaged, is of great importance to the community.

The solution of this question is not unattended with some difficulty, as some of the most important authorities on one of the particular points to be decided are not accessible to the court.

Recurring to adjudicated cases and to works of established authority, to ascertain who are to be regarded as common carriers, we find them defined by Chancellor Kent in his Commentaries, vol. 2, p. 598, to be such persons " as undertake generally, and for all people indifferently, to convey goods and deliver them at a place appointed, for hire, and with or without agreement as to price."

Mr. Justice Story, in his treatise on Bailments, p. 322, lays down that " to bring a person within the description of a common carrier, he must exercise it as a public employment; he must undertake to carry goods for persons generally, and he must hold himself out as ready to engage in the transportation of goods for hire, as a business, not as a casual occupation, *pro hac vice.*"

He then proceeds: "A common carrier has therefore been defined to be one who undertakes for hire, or reward, to transport the goods of such as choose to employ him, from place to place." This definition is the one substantially given in the notes to 2 Black. Com. p. 451; and in the notes to the case of Coggs v. Bernard of the English and American editors of Smith's L. C. p. 82; on this subject see 1 Bay, 97; 2 Bailey, 421; 2 Rich. 286; 2 Dana, p. 431; 7 Yerg. 340. In all these the definition of common carriers, by both land and water transportation, accords in substance with those above quoted in full from the elementary works of Judges Kent and Story. In the notes of the American [118] editors of Smith's L. C. p. 178, the subject is said to have been examined in the case of Gordon v. Hutchinson, 1 Watts & Serg. p. 285; and the rule deduced is, that "a wagoner who carries goods for hire is a common carrier, whether transportation be his principal and direct business, or an occasional and incidental employment."

This rule is decisive of the precise question in this controversy, and it is, therefore, the more to be regretted that the volume of reports is not within the reach of the court, that we might ascertain, beyond all doubt, how far the facts of that case were analogous to those now under consideration.

In McClure v. Richardson, Rice (S. C.) p. 215, the facts are somewhat similar to those presented in this record. The syllabus of the reporter shows that the defendant was owner of a boat, in which he was accustomed to carry his own cotton to Charleston, and *occasionally*, when he had not a load of his own, to take for his neighbors, they paying freight for the same. The general habit was for those who wished to send cotton by defendant's boat to apply to the defendant himself. On this occasion the patroon of the boat had been told to take Col. Goodwin's and Mr. Dallas' cotton, which he had done, when the plaintiff applied to the patroon, in the absence of the defendant, to take on board ten bales of cotton, asking him if it was necessary to apply to the defendant himself, to which the patroon replied, he thought not, and received the cotton: *Held*, that under the circumstances the defendant

was bound by the act of the patroon, as being within the general scope of the authority conferred upon him by placing him in the situation of master of the boat; and that the defendant was consequently chargeable as a common carrier for any loss or damage to the plaintiff's cotton.

In the above case the defendant was not usually, but only *occasionally*, employed in carrying goods for the community; but this did not shield him from responsibility under the [119] rule rendering common carriers liable for the acts of their servants and other persons in their employment. Story on Bailments, p. 327; 8 Term, p. 531; 5 id. 397.

It appears from the foregoing authorities, that the distinctive characteristic of a common carrier is, that he transports goods for hire for the *public generally*, and that it is immaterial whether this is his usual or occasional occupation, his principal or subordinate pursuit.

The defendants having contended that they are only bailees for hire in the particular case, and incur only their responsibilities, let us examine the authorities as to private carriers, to ascertain whether this position can be maintained.

We have seen that carrying goods for hire for the public generally, and pursuing it as a principal or incidental occupation, will render a person a common carrier; but it is not the mere undertaking to carry goods for hire that will involve a person in all the risks of the public carrier. In the treatise on Bailments, p. 322, by Mr. Justice Story, we find that "a private person may contract with another for the carriage of his goods, and incur no responsibility beyond that of an ordinary bailee for hire; that is to say, the responsibility of ordinary diligence." In support of this rule he refers to various reported cases, none of which have I been able to procure, except those reported in Bosanquet and Puller, and in Wendell's New York Reports.

The facts in these cases, it will be found, bear no analogy to those presented in this appeal. In Robinson v. Dunmore, 2 Bos. & Pull. p. 417, the defendant was not charged as a common carrier, but on a special undertaking, and the principal question was whether he had possession of the goods

when they were damaged. Chambre, justice, in his opinion says the defendant is not a common carrier by trade, but has put himself into the situation of one by his particular warranty. It does not appear from the case that the defendant [120] was ever, on any other occasion, employed to transport goods to the country.

In Saterlee et al. v. Groat, 1 Wend. 272, the facts were that the defendant had been a common carrier previous to 1819; that he then sold out all his teams but one, which he kept for agricultural purposes on his farm. One witness, however, testified that defendant employed his team in the carrying business, as occasions offered, until 1822 or 1823; subsequent to that period there was no evidence of his forwarding a single load until 1824, when, at the urgent request of one John Dows, he reluctantly consented to bring some boards for him from Albany to Schenectady, and despatched one Asia with a team for that purpose, with special instructions to bring nothing for any other person; if Dows' goods were not ready, to come back empty. The teamster brought two loads; but Dows' third load not being ready, he disobeyed the instructions of defendant and took a load for the plaintiff; a portion of which he subsequently stole.

The defendant was held to be not responsible as a common carrier, because he had abandoned the business, entirely for certainty, one year, and according to the weight of evidence, for four years previous to the transaction. That his contract to bring Dows' goods from Albany was a special one, and he was acting under this contract, and not in the capacity of a common carrier; and the teamster, having been employed for a particular purpose and object, could not bind the defendant by a contract beyond his special employment. There is a feature in the above case identical with the principal one developed in this record, viz.: that the defendant *occasionally* until 1822 or 1823 pursued the forwarding business. Previous to 1819, this was his entire occupation. The court draws no distinction as to his capacity, from the fact of carrying being his *constant* or *occasional* employment. They are classed together in contradistinction to his subsequent en-

gagement, by a special contract, to transport goods for a particular person.  By the former he was clothed with [121] the character of a common carrier, with all its duties, obligations and risks; by the latter he was subjected only to the responsibilities of an ordinary bailee for hire.  In Sniddler v. Hilliard and Brooks, 2 Rich. (S. C.) p. 302, it is said that " one who does not usually exercise the employment of carrying goods for hire, but only in a single instance does so, will incur no responsibility beyond that of an ordinary bailee for hire, and will not be answerable for any loss by means against which he could not have guarded by ordinary diligence."

From the rules, as to what constitutes a private carrier, as deducible from the definitions of Mr. Justice Story and the cases above examined, it will be seen that he is a person who does not pursue at all the business of transporting goods for hire, either usually or occasionally, and that he is only employed, by a special contract, to transport goods for a particular person.

The circumstances under which the defendants were employed are very different.  At a certain period of the year, known as the hauling season, they engage in the forwarding business, and run their wagon whenever they meet with an opportunity.  They have none of the characteristics, and cannot therefore come under the denomination of private carriers.

From a comparison of the various authorities, to which we have referred for the distinguishing characteristics of both common and private carriers, it may be laid down as a rule, that all persons who transport goods from place to place, for hire, for such persons as see fit to employ them, whether usually or occasionally, whether as a principal or an incidental and subordinate occupation, are common carriers and incur all their responsibilities.

There are no grounds in reason, why the occasional carrier who, periodically in every recurring year, abandons his other pursuits and assumes that of transporting goods for the public, should be exempted from any of the risks incurred by [122] those who make the carrying business their constant or

principal occupation. For the time being he shares all the advantages arising from the business; and as the extraordinary responsibilities of a common carrier are imposed by the policy, and not the justice of the law, this policy should be uniform in its operation, imparting equal benefits and inflicting the like burthens upon all who assume the capacity of public carriers, whether temporarily or permanently, periodically or continuously.

Applying the rules of law, then, to the facts of this case, the defendants must be regarded as common carriers, and consequently subject to their responsibilities.

What, then, are the responsibilities of the common carrier? He is liable for all losses, except such as may arise from the act of God, or the enemies of the country, or the fault of the party complaining. 1 Washington's C. C. 13, 17; 2 Bailey, p. 422; 2 Kent, p. 597; Story on Bailments, p. 330. He is an insurer against all losses not embraced in the excepted cases. As is well expressed in the dissenting opinion of Mr. Justice Nott, in Cook v. Gourdin, 2 N. & McC. p. 19: "No force however great, no accident however inevitable, no fraud however beyond his control, will excuse him." He is liable not only for losses occasioned by secret theft or embezzlement, but for those inflicted by highway robbery, by the spoliation and outrages of mobs, rioters and insurgents. The most resistless and destructive conflagration, if occasioned by human agency, without any negligence whatever on the part of the carrier, will furnish no valid ground of exemption. Story on Bailments p. 338.

The reason assigned by Lord Holt in Coggs v. Bernard, 2 Ld. Raym. 209, 918, for imposing liabilities so onerous on the carrier, is, that "this is a politic establishment, contrived by the policy of the law, for the safety of all persons, the necessity of whose affairs obliges them to trust these sorts of persons, that they may be safe in their dealings. [123] For else, these carriers might have an opportunity of undoing all persons that had any dealings with them, by combining with thieves, etc., and yet doing it in such a clandestine manner as would not be possible to be discovered. And this is the reason

the law is founded upon in that point. Mr. Chief Justice Best, in Riley v. Horne, 5 Bing. 217, thus forcibly expounds the grounds on which this policy of the law is founded:

"When goods are delivered to a carrier they are usually no longer under the eye of the owner; he seldom follows or sends any servant with them to the place of their destination. If they should be lost or injured by the grossest negligence of the carrier or his servants, or stolen by them, or by thieves in collusion with them, the owner would be unable to prove either of these causes of loss; his witnesses must be the carriers' servants, and they, knowing that they could not be contradicted, would excuse their masters and themselves." But whatever may be the grounds on which this inflexible rule is based, there is no doubt but that it has been the law of England for ages (2 Kent, p. 597), and was therefore the law of Texas at the occurring of the cause of action in this case.

The appellees contend that, even as common carriers, they are exempt from liability, as the cotton was lost by an act of God, and not from any negligence on their part.

What is meant by an act of God, such as constitutes a ground for the carrier's excuse? Lord Mansfield in Froward v. Pittard, 1 Term, p. 27, considers that it "means something in opposition to the act of man, for every thing is the act of God which happens by his permission; every thing by his knowledge. But to prevent litigation, collusion and the necessity of going into circumstances impossible to be unraveled, the law presumes against the carrier, unless he shows it was done by the king's enemies, or by such act as could not happen by the intervention of man, as storms, lightning and tempests."

[124] Mr. Story, in his work, defines it to be an accident produced by physical causes which are irresistible; such as a loss by lightning and storms, by the perils of the seas, inundations and earthquakes, or by sudden death or illness.

The defendants contend, if their ground be fully understood, that they had exercised due precautions to avoid danger from the camp fire, and that the wind which arose in the night and

carried the fire to the cotton, should be regarded among those inevitable physical accidents which are termed acts of God, and which cannot be guarded against by human prudence or foresight.

If this were a case in which the liability of the bailee depended wholly upon proof of his negligence, I should consider the placing of bales of cotton, partially bursted open, within fifteen feet of a winter camp fire, as indicative of such negligence as would furnish ground for the recovery of damages for the loss sustained. Such evidence might indeed be material, if the loss be considered as arising from an act of God, or entirely from a physical cause; for even then negligence on the part of the carrier would make him liable. Story on Bailments, 332–334. But if the loss arise not from an act of God, then evidence of the utmost care is irrelevant, and must be thrown out of consideration. McArthur v. Sears, 21 Wend. 190; 2 Kent, 602; 2 Bailey, 21; Story, 338.

There is no pretense in this case that the fire originated from lightning or spontaneous combustion; and it is substantially conceded that the burning of the cotton proceeded from the camp fire itself. It cannot be seriously contended that an ordinary wind blowing this fire on the cotton is such an act of God as will exempt the carrier, or that he will not be liable for loss by effects of this wind, whether proximate or remote. This is a physical cause which is easily resisted. The blowing of the wind is one of the most ordinary operations of nature, and its springing up suddenly is of constant [125] occurrence throughout the world, and in no country more frequent than in Texas.

Had a storm arisen and driven the fire with resistless fury on the cotton, placed at a suitable distance from the camp, the defendant's liability might perhaps have been avoided. But I have not found any authority which shows that fire, arising from any other cause than lightning, is such an act of God as would excuse a carrier from liability. There is no doubt, however, that spontaneous combustion would be so considered.

In the case of Froward v. Pittard, 1 Term, 27, the loss was occasioned by fire. The booth where the defendant had de-

posited his hops was one hundred yards distant from the one in which the fire originated. The fire burnt for some time with unextinguishable violence; and during that time the booth in which the defendant had deposited his hops was, with the hops themselves, entirely consumed without any *negligence in the defendant.* The court held that the carrier was liable for events independent of his contract; that besides all due care and diligence, the law imposed upon him all the responsibilities of an insurer. That the fire arose in this case from some act of man, and not without his intervention, as do storms, lightning and tempests, and that the carrier was liable, inasmuch as he is liable for *inevitable accident.* The inevitable accident which excuses a carrier is one which springs from physical agency alone, and not from human force or fraud, except the force be exerted by a public enemy.

In the case just cited the carrier is said to be liable, though robbed by an armed force, or by mobs of power so resistless as those engaged in the riots in London in 1780. Dudley, S. C. 159; 2 Rich. 286. In McArthur v. Sears, 21 Wend. 190, the judge says that he has sought in vain for any case to excuse the loss of the carrier, where it arises from human action or neglect, or from any combination of such action or neglect, except force exerted by a public [**126**] enemy; no matter what degree of prudence may be exercised by the carrier and his servants, although the delusion by which it is baffled, or the force by which it is overcome, be inevitable, yet if it be the result of human means the carrier is responsible. Had the springing up of an ordinary wind any just right to be regarded such an act of God as would excuse the carrier; yet in the destruction of this cotton, there was such a mixture of human agency as would throw the loss on the defendants. The fire itself was here, as in the case cited from the 1st Term, kindled by human means; nor was the wind a dangerous object, and was only made so by the teamsters placing the wagon in the particular position where alone its mischievous powers could be developed.

The defendants then being common carriers, and the destruction of the cotton not having been occasioned by an act

of God, or other accident which would by law excuse a carrier, are liable for the loss, and there was, therefore, error in the judgment of the court below.

We forbear to discuss or decide any other questions than those presented by the record; as, for instance, whether a common carrier is liable in an action for refusal to carry goods, when a reasonable compensation is tendered, and when there is no proper ground for the refusal; or, as to how far a carrier may avoid liability by notices or special agreements; nor do I think it necessary to extend observations upon the wisdom of the policy in relation to the liabilities of common carriers. It was the law at the time the loss occurred, though if the fire had been wholly accidental, that is, without negligence, the carrier would not, under the laws of Spain, have been liable. 2 Partidas, 743-4; 6 Martin. The principle has for ages been considered to be of eminent value to the morals and eminence of all countries where the common law of England prevails; and Mr. Chancellor Kent admires the steady and firm support which the English courts of justice have uniformly and inflexibly given to the salutary rules of law on the subject, without [127] bending to popular sympathies or yielding to the hardships of a particular case. 2 Kent, 601-2.

The error in the form of the verdict is so glaring that we cannot pass it entirely without notice. It does not find the issue in the case at all.

It only finds all costs against the plaintiff, thus substituting an incident for the principal, a legal result of a certain determination of the facts involved, and not that determination itself. It is wholly irregular, if not entirely insufficient, and should have been at once corrected. It is not necessary to decide in this case whether a judgment for the defendants on this verdict could be supported, as the cause has already been decided on the other points.

It is ordered, adjudged and decreed that the judgment of the court below be reversed, and that the cause be remanded for a new trial.