# IN THE SUPREME COURT OF TEXAS

═══════════════

No. 18-0458

═══════════════

VIA METROPOLITAN TRANSIT, PETITIONER,

v.

CURTIS MECK, RESPONDENT

═══════════════════════════════

ON PETITION FOR REVIEW FROM THE
COURT OF APPEALS FOR THE FOURTH DISTRICT OF TEXAS

═══════════════════════════════

**Argued February 25, 2020**

JUSTICE BOYD delivered the opinion of the Court, in which JUSTICE GREEN, JUSTICE LEHRMANN, JUSTICE BLACKLOCK, and JUSTICE BUSBY joined.

CHIEF JUSTICE HECHT delivered a concurring opinion in which JUSTICE GUZMAN, JUSTICE DEVINE, and JUSTICE BLAND joined.

The common law has long required common carriers to exercise a "high degree of care" for their passengers, imposing on common carriers the duty to act as a very cautious, competent, and prudent person would act under the same or similar circumstances. A jury found that VIA Metropolitan Transit, a governmental entity, breached that duty to Curtis Meck, a passenger who was injured while riding a VIA bus. VIA appeals the judgment entered on that finding, arguing (1) the high-degree-of-care duty does not, or should not, apply in this case, (2) even if the high-degree-of-care duty applies, the Texas Tort Claims Act does not waive governmental immunity against suits for breach of that duty, and (3) no evidence supports the jury's finding that VIA breached the high-degree-of-care duty to Meck. We affirm.

# I.
## Background

Created in 1977, VIA Metropolitan Transit is a public transit authority serving San Antonio and the Bexar County area. As the county's primary means of public transportation, VIA operates some 450 buses and over 100 paratransit vans carrying tens of millions of passengers a year. A statutorily authorized entity, VIA is "a public political entity" and "governmental unit" that "exercises public and essential governmental functions." TEX. TRANSP. CODE § 451.052(a), (c).

In February 2013, Curtis Meck boarded a VIA bus operated by Frank Robertson, who was new to the job and still in training. Robertson's "line instructor," Wanda Scott, stood behind him. Meck boarded the bus and grabbed onto a hanging strap. As Robertson began to pull away from the stop, another passenger shouted "Back door!," apparently to notify Robertson that a passenger was still trying to exit from the bus's rear door. Traveling just under five miles per hour, Robertson made an "abrupt stop," causing Meck to fall forward into the partition behind Robertson's seat. Meck initially complained of injuries to his neck and shoulder. After several months of treatment, he underwent surgery to repair a herniated disc in his neck.

Meck sued VIA, asserting a claim for negligence. In an amended petition, Meck alleged that VIA was a common carrier and thus owed a duty to exercise "a high degree of care." VIA generally denied Meck's allegations and asserted governmental immunity, but it did not specifically challenge the high-degree-of-care duty and did not file a plea to the jurisdiction.

During jury selection and opening statements, Meck told the jury that the high-degree-of-care duty applied, and he questioned witnesses about VIA's standard of care under that duty. VIA did not object to these statements or questions; instead, it asserted in its opening statement that Robertson acted as "a highly cautious person." It also asked witnesses whether Robertson

2

exercised a high degree of care. After both sides closed, however, VIA moved for a directed verdict on the ground that it is not a common carrier, is not subject to the higher negligence duty, and is immune from claims asserting breach of that duty.

The trial court denied VIA's motion and submitted the case to the jury using the higher negligence duty. Specifically, the court asked the jury whether VIA's negligence through Robertson proximately caused the occurrence and—over VIA's objection—instructed the jury that:

> "Negligence," means failure to use a high degree of care, that is, failing to do that which a very cautious, competent, and prudent person would have done under the same or similar circumstances or doing that which a very cautious, competent, and prudent person would not have done under the same or similar circumstances.
>
> "High degree of care" means that degree of care that would have been used by a very cautious, competent, and prudent person under the same or similar circumstances.

The jury found that VIA's negligence proximately caused Meck's injuries and $121,000 in damages. The trial court denied VIA's post-trial motions, applied the Texas Tort Claims Act's damages cap, and entered judgment awarding Meck $100,000. The court of appeals affirmed, 587 S.W.3d 14, 17 (Tex. App.—San Antonio 2018), and we granted VIA's petition for review.

## II.
## High Degree of Care

Except when specifically provided otherwise, "the duties and liabilities of a carrier in this state and the remedies against the carrier are the same as prescribed by the common law." TEX. TRANSP. CODE § 5.001(a)(1). For at least 220 years (and 165 years in Texas), the common law has

required common carriers to exercise a "high degree of care" toward their passengers.[1] This duty does not make carriers strictly liable as insurers or require them to employ the "utmost," "highest," or "greatest" degree of care. *Gulf, Colo. & Santa Fe Ry. Co. v. Conley*, 260 S.W. 561, 563 (Tex. 1924). But in contrast to the ordinary-care standard, we have repeatedly held that a common carrier owes a duty to its passengers to act as "a very cautious and prudent person" would act under the same or similar circumstances. *Speed Boat Leasing v. Elmer*, 124 S.W.3d 210, 212 (Tex. 2003) (per curiam) (quoting *Dall. Ry. & Terminal Co. v. Travis*, 78 S.W.2d 941, 942 (Tex. [Comm'n Op.] 1935)); *see Mount Pleasant Indep. Sch. Dist. v. Lindburg*, 766 S.W.2d 208, 213 (Tex. 1989); *City of Dallas v. Jackson*, 450 S.W.2d 62, 63 (Tex. 1970).

VIA argues that the trial court erred by instructing the jury to apply the higher negligence duty in this case because VIA is not a common carrier. And should we disagree, VIA urges us to overrule our precedent, reject the higher negligence duty, and hold that common carriers owe only an ordinary degree of care to their passengers. We conclude that VIA is a common carrier, and we decline to consider overruling our precedent because the evidence in this case would have supported liability under the ordinary negligence duty as well as the higher negligence duty.

## A. Common Carrier

Common carriers are persons or entities that are "in the business of carrying passengers and goods [and] who hold themselves out for hire by the public." *Mount Pleasant*, 766 S.W.2d at

---

[1] English common law has held common carriers *of goods* to a strict-liability duty since at least the early 1600s, based not only on the tort concept of negligence but on a combination of negligence and the contract theories of bailment and assumpsit. *See* Robert J. Kaczorowski, *The Common-Law Background of Nineteenth-Century Tort Law*, 51 Ohio St. L.J. 1127, 1129–30 (1990). The common law has imposed the higher negligence duty on common carriers *of passengers* since at least the 1790s. *Id.* at 1159–60. The U.S. Supreme Court first recognized this duty in 1839, *see Stokes v. Saltonstall*, 38 U.S. (13 Pet.) 181, 191–92 (1839), and we have recognized it since at least 1855, *see Albright v. Penn*, 14 Tex. 290, 298 (1855).

213 (citing *Mayhew v. McFarland*, 153 S.W.2d 428, 431 (Tex. 1941)). To qualify as a common carrier (in contrast to a private carrier), the entity must provide transportation services to the general public, as opposed to providing such services only for particular individuals or groups. *Id.* at 213 (citing *Chevallier v. Straham*, 2 Tex. 115, 119 (1847)). The provision of those services must be the entity's "primary function," such that the determination of whether an entity is a common carrier turns on "whether the primary purpose of the operator in question is, in fact, the business of transporting people or goods." *Speed Boat Leasing*, 124 S.W.3d at 211, 213.[2]

VIA concedes that it regularly provides transportation services to the general public for a fee, but argues it is not a common carrier because (1) it is not "in the business" of providing such services, (2) providing such services is not its "primary function," and, (3) in any event, it cannot be a common carrier because it is a governmental body that performs only governmental functions. We find each of these arguments unpersuasive.

### 1. "In the business"

To be a common carrier, one must be in "the business of transporting people or goods." *Id.* at 211. As a general principle, an entity is "doing business" if it performs "a series of similar acts for the purpose of thereby realizing pecuniary benefit, or otherwise accomplishing an object, or doing a single act for such purpose with the intention of thereby initiating a series of such acts."

---

[2] We have held that common carriers include a public bus system owned and operated by a municipal transit authority, *Jackson*, 450 S.W.2d at 62–63; a passenger railway company, *Conley*, 260 S.W. at 562; *Int'l & Great N. R.R. Co. v. Halloren*, 53 Tex. 46, 53 (1880); a truck operator who hauls goods, *Mayhew*, 153 S.W.2d at 428; a street railway that transports passengers, *Travis*, 78 S.W.2d at 942; and a cotton-hauling wagon, *Chevallier*, 2 Tex. at 116. By contrast, we have held that an operator that offers speed-boat "thrill rides," *Speed Boat Leasing*, 124 S.W.3d at 211, 213; a school district that operates school buses, *Mount Pleasant*, 766 S.W.2d at 212–13; and a tow-truck operator who gives a ride to the owner of car being towed, *Speed Boat Leasing*, 124 S.W.3d at 212–13 (citing *Howell v. City Towing Assoc., Inc.*, 717 S.W.2d 729, 731, 733 (Tex. App.—San Antonio 1986, writ ref'd n r.e.)), were not common carriers.

*Mayhew*, 153 S.W.2d at 431 (quoting RESTATEMENT (FIRST) OF CONFLICT OF LAWS § 167 cmt. a (AM. LAW INST. 1934)). In the common-carrier context, we have determined whether an entity is "in the business" of providing transportation to the general public for a fee by considering whether it "hold[s] itself out for" that purpose, "would undertake such tasks if requested to do so," and was "created to operate a transport business." *Mount Pleasant*, 766 S.W.2d at 213.

Under this standard, VIA is indisputably in "the business of transporting people." *Speed Boat Leasing*, 124 S.W.3d at 211. VIA does not deny that it holds itself out for this purpose, that it serves this purpose for the general public, and that it provides its services for a fee.[3] As its own representative conceded at trial, "the primary business of VIA is transporting people and their stuff around Bexar County." Nevertheless, VIA argues that it is not "in the business" of transporting the public because it does not seek to make—and in fact is statutorily prohibited from making—a "profit." We disagree.

While we acknowledge that VIA is statutorily prohibited from generating revenue greater than an amount "sufficient to meet [its] obligations," TEX. TRANSP. CODE § 451.061(a), (b), we do not agree that non-profit or not-for-profit entities cannot be "in the business" of a commercial enterprise. To the contrary, we have said that "non-profit water supply corporations" are "engaged in the business of acquiring, storing, transporting, selling, or distributing water," *N. Alamo Water Supply Corp. v. Willacy Cty. Appraisal Dist.*, 804 S.W.2d 894, 895 (Tex. 1991); *Leander Indep. Sch. Dist. v. Cedar Park Water Supply Corp.*, 479 S.W.2d 908, 909–10 (Tex. 1972), cities may be

---

[3] Although a common carrier must offer its services "for hire" or "for a fee," we have held "that the payment of consideration is not essential to the establishment of a passenger-common carrier relationship" with a particular plaintiff, but instead "is a factor in deciding whether such a relationship was created." *Mount Pleasant*, 766 S.W.2d at 213 (citing *Gulf, Colo. & Santa Fe Ry. Co. v. McGown*, 65 Tex. 640, 646 (1886) (holding that railroad was liable as a common carrier to passenger who was injured while traveling on a free pass)).

6

"in the business of selling electricity, gas, and water," *Gibson Distrib. Co. v. Downtown Dev. Ass'n of El Paso, Inc.*, 572 S.W.2d 334, 335 (Tex. 1978), and public utility corporations are engaged "in the business of a public utility," *Carney v. Sw. Motor Transp., Inc.*, 267 S.W.2d 802, 803 (Tex. 1954).

In determining whether a defendant is a common carrier, we said long ago that our focus must be on "the public character of the carrier's employment," and not "on the character or adequacy of the consideration" the carrier receives for its service. *McGown*, 65 Tex. at 647. And recently, we specifically declined to mandate "a profit-seeking motive as a prerequisite" to being "engaged in the business" of selling products. *Centerpoint Builders GP, LLC v. Trussway, Ltd.*, 496 S.W.3d 33, 41 n.10 (Tex. 2016). Just as not-for-profit entities like Goodwill and the Salvation Army are "in the business" of selling goods and clothing, we conclude that VIA is "in the business" of transporting people and goods because it holds itself out for the purpose of providing such services to the general public for a fee.[4]

### 2. Primary function

In one of our earliest decisions, we held that "the distinctive characteristic of a common carrier is, that he transports goods for hire for the *public generally,* and that it is immaterial whether this is his usual or occasional occupation, his principal or subordinate pursuit." *Chevallier*, 2 Tex. at 119. More recently, however, we have held that a person is in the business of transportation only if "the primary purpose of the operator in question is, in fact, the business of transporting people

---

[4] In holding in *Mount Pleasant* that a school district that operated school buses for its students was not a common carrier, we noted, among other things, that the district "operates the bus service for the convenience of the pupils and not for the purpose of profit." 766 S.W.2d at 213. But we have never held, and did not hold in *Mount Pleasant*, that an enterprise is a common carrier *only* if it operates for "the purpose of profit." Our observation in *Mount Pleasant* was merely to support our conclusion that the district was "not in the business of carriage *for hire*." *Id.* (emphasis added).

7

or goods." *Speed Boat Leasing*, 124 S.W.3d at 213 (holding that speed-boat-ride operator was not a common carrier because "its primary purpose is to entertain, not to transport from place to place"). When the task of transporting people or goods from place to place is "only incidental" to an operator's primary purpose, it is not a common carrier. *Id.*; *see also Mount Pleasant*, 766 S.W.2d at 213 (noting that school district's actions in bussing children to and from school was "only incidental to the operation of the schools"); *Centerpoint Builders*, 496 S.W.3d at 40 (holding that "one is not 'engaged in the business of' selling a product if providing that product is incidental to selling services").

Contrary to its representative's testimony that "the primary business of VIA is transporting people and their stuff around Bexar County," VIA now argues that it is not a common carrier because transporting passengers and goods is not in fact its primary function. Instead, VIA argues, it performs numerous governmental functions that include constructing roads, issuing bonds, collecting taxes, and promoting economic development,[5] all for the purpose of "implementing the State's transportation policy" and to fulfill "the Legislature's goals of reducing air pollution and traffic congestion." *See* TEX. TRANSP. CODE §§ 451.065, .204, .352, .401.

Again, we are not convinced. The statutes that govern VIA no doubt grant it a broad array of powers, but it may only use those powers to fulfill its obligation to operate as a "rapid *transit* authority." *Id.* § 451.001(2) (emphasis added). It may own, control, and operate property—referred to in the statute as the "transit authority system"—only "for mass transit purposes," which the statute defines as "the transportation of passengers and hand-carried packages or baggage of a

---

[5] VIA notes, for example, that it funded and constructed the Alamodome, which it later leased and then transferred to the City of San Antonio.

8

passenger by a surface, overhead, or underground means of transportation, or a combination of those means, including motorbus, trolley coach, rail, and suspended overhead rail transportation." *Id.* § 451.001(4), (8). It may sell, lease, or dispose of property that is not necessary for "the efficient operation and maintenance of the transit authority system." *Id.* § 451.054(e). It may condemn property and issue bonds only if necessary and appropriate for the development or extension of "the transit authority system." *Id.* § 451.059(a). While we do not doubt that VIA plays an important role in promoting greater statewide goals, it does that by fulfilling its "mass transit purposes," which is its primary function.

### 3. Governmental functions

VIA's chief contention in this Court is that it cannot be a common carrier because it is a governmental entity that performs only governmental, as opposed to proprietary, functions. *See id*. § 451.052(c) ("An authority is a governmental unit under [the Texas Tort Claims Act], and the operations of the authority are not proprietary functions for any purpose, including the application of [the Texas Tort Claims Act]."). We disagree.

Initially, we reject the suggestion that a governmental entity cannot be a common carrier. We previously recognized that a public transportation system owned and operated by a department of the City of Dallas was a common carrier that owed its passengers a high degree of care. *See*

*Jackson*, 450 S.W.2d at 63. Texas courts of appeals have similarly recognized that governmental entities can be common carriers,[6] as have the courts of numerous other states.[7]

VIA asserts, however, that unlike the City of Dallas in *Jackson*, VIA operates its public transit system exclusively as a governmental function, and not as a proprietary function. *See* TEX. TRANSP. CODE § 451.052(c). The proprietary/governmental dichotomy, however, determines whether governmental immunity protects a governmental entity against claims and liabilities arising from the entity's conduct, not whether the entity is "in the business" of engaging in that conduct. *See Wasson Interests, Ltd. v. City of Jacksonville*, 489 S.W.3d 427, 433 (Tex. 2016). We agree that, because VIA only performs governmental functions, governmental immunity protects VIA unless the legislature has waived that immunity, an issue we address below. But for present purposes, the issue is not whether VIA enjoys governmental immunity, but whether it is "in the business" of transporting the general public for hire and thus a common carrier. That its business

---

[6] *See Dall. Area Rapid Transit v. Morris*, 434 S.W.3d 752, 757 (Tex. App.—Dallas 2014, pet. denied) (holding public transit authority is a common carrier); *Bryant v. Metro. Transit Auth.*, 722 S.W.2d 738, 739 (Tex. App.—Houston [14th Dist.] 1986, no writ) (same); *see also VIA Metro. Transit Auth. v. Reynolds*, No. 04-18-00083-CV, 2018 WL 3440701, at *2–3 (Tex. App.—San Antonio July 18, 2018) (mem. op.) (same, relying on court of appeals decision in this case).

[7] *Lopez v. S. Cal. Rapid Transit Dist.*, 710 P.2d 907, 908 (Cal. 1985) (holding public transit district is "engaged as a common carrier in the business of transporting members of the general public"); *Acosta v. S. Cal. Rapid Transit Dist.*, 465 P.2d 72, 78 (Cal. 1970) (same); *Fujimura v. Chi. Transit Auth.*, 368 N.E.2d 105, 108 (Ill. 1977) (holding public transit authority is a "public carrier" that "owes those whom it serves the highest degree of care"); *Letsos v. Chi. Transit Auth.*, 265 N.E.2d 650, 653 (Ill. 1970) (same); *Knapp v. City of Detroit*, 294 N.W. 692, 693 (Mich. 1940) (identifying city as a "street railroad carrier"); *Maison v. NJ Transit Corp.*, 214 A.3d 189, 196 (N.J. Super. Ct. App. Div. 2019) ("[O]ur case law has viewed bus lines generally, and public transit systems specifically, as common carriers for many years.") (pet. granted, 222 A.3d 334 (N.J. 2019)); *Crosland v. N.Y.C. Transit Auth.*, 498 N.E.2d 143, 144 (N.Y. 1986) (treating public transit authority at a "publicly owned common carrier"); *Weiner v. Metro. Transp. Auth.*, 433 N.E.2d 124, 127 (N.Y. 1982) (holding public transit authority engages in "common carrier activity"); *Bracco v. MABSTOA*, 117 A.D.2d 273, 278 (N.Y. App. Div. 1986) ("The fact that a common carrier is operated by a governmental entity does not mean it has a lesser responsibility toward the public than one which is under private ownership."); *Brant v. Tri-Cty. Metro. Transit Dist.*, 213 P.3d 869, 872 (Or. Ct. App. 2009) (holding public transportation district is a common carrier that "owes its passengers the highest degree of care and skill practicable for it to exercise"); *O'Dee v. Tri-Cty. Metro. Transp. Dist. of Or.*, 157 P.3d 1272, 1275 (Or. Ct. App. 2007) (same); *Mangini v. Se. Pa. Transp. Auth.*, 344 A.2d 621, 621–22 (Pa. Super. Ct. 1975) (same); *White v. Metro. Gov't of Nashville & Davidson Cty.*, 860 S.W.2d 49, 52 (Tenn. Ct. App. 1993) (same).

10

constitutes a governmental function does not preclude it from being a common carrier. *See Fujimura*, 368 N.E.2d at 108 (explaining that the Chicago Transit Authority is a common carrier that "performs a unique governmental function").

Because VIA's primary function is the business of providing transportation to the general public for a fee, we hold that VIA is a common carrier that owes its passengers the duty to exercise a high degree of care, regardless of whether it is a governmental entity that provides that service as a governmental function.

## B. Precedent

As an alternative basis to avoid the higher negligence duty, VIA urges us to overrule our precedent, reject any distinction between "degrees of negligence,"[8] and hold that negligence always and only involves the breach of a duty to exercise the ordinary care a reasonable person would exercise under the same or similar circumstance. According to VIA, the determination of whether the negligence duty in a given case includes a duty to act in particularly cautious, competent, and prudent ways should be a question of fact for the fact-finder to decide based on the evidence of the particular circumstances, rather than a legal duty imposed upon the fact-finder by the court as a matter of law. Just as a physician is held to a "physician-of-ordinary-prudence standard" requiring the "ordinary care" a physician would exercise under the circumstances, *see Jackson v. Axelrad*, 221 S.W.3d 650, 656–57 (Tex. 2007), VIA asserts that specially trained bus operators should also be held only to the standard of what a bus operator of ordinary prudence would do under the same or similar circumstances.

---

[8] *See Galveston City Ry. Co. v. Hewitt*, 3 S.W. 705, 707 (Tex. 1887) (discussing the "three degrees or grades of negligence," classified as gross negligence, ordinary or simple negligence, and slight negligence, the application of which "must depend on the circumstances of each particular case" because "the greater the hazard, the more complete must be the exercise of care").

11

VIA provides some weighty support for its proposal, pointing to other states that have abandoned the distinction between degrees of negligence or at least suggested that they should no longer be recognized.[9] The Restatements and some legal commentators agree.[10]

---

[9] New York, for example, while recognizing that the common law imposed the higher negligence duty because of "the perceived ultrahazardous nature of the instrumentalities of public rapid transit" and the passengers' "total dependency" on carriers "for safety precautions," rejected the "stratification of degrees of care as a matter of law" in favor of "different amounts of care, as a matter of fact." *Bethel v. Bethel v. N.Y.C. Transit Auth.*, 703 N.E.2d 1214, 1215–17 (N.Y. 1998). The court reasoned that the higher negligence duty improperly invites the jury "to scrutinize the carrier's conduct in an endeavor to find it defective" and is no longer required because, "through technological advances and intense governmental regulation, public conveyances . . . have become at least as safe as private modes of travel." *Id.* at 1216–17 (citation and quotations omitted). The court concluded that "the single, reasonable person standard is sufficiently flexible by itself to permit courts and juries fully to take into account the ultrahazardous nature of a tortfeasor's activity." *Id.* at 1217.

Courts in a few other states have expressed a similar view. *See, e.g.*, *Nunez v. Prof'l Transit Mgmt. of Tucson, Inc.*, 271 P.3d 1104, 1109 (Ariz. 2012) ("[A]ny dangers in common carriage and the passenger's dependence upon the carrier can appropriately be considered under the general standard of reasonable care under the circumstances."); *Sebastian v. District of Columbia*, 636 A.2d 958, 962 (D.C. 1994) ("This court, however, has never imposed a higher duty on common carriers or extended liability beyond standard negligence or scope of employment *respondeat superior* principles."); *Frederick v. City of Detroit, Dep't of St. Rys*, 121 N.W.2d 918, 923 (Mich. 1963) ("[W]hen a duty arises as a matter of law between a carrier and its passengers, it is the common law duty of due care and it may be defined simply as the duty to exercise such diligence as would be exercised in the circumstances by a reasonably prudent carrier."); *Union Traction Co. of Ind. v. Berry*, 121 N.E. 655, 657 (Ind. 1919) ("Where a duty to exercise care exists, it is always the same, regardless of the nature of the relation out of which it arises. It cannot be said that the duty to use care which arises out of the relation of carrier and passenger differs in kind, character, or degree from the duty which arises out of the relation of master and servant, or out of any other relation which imposes the legal duty to use care.").

[10] *See, e.g.*, RESTATEMENT (THIRD) OF TORTS: PHYS. & EMOT. HARM §§ 3 cmt. f (AM. LAW. INST. 2010) (stating that the high-degree-of-care duty "implies no departure from the general" ordinary-negligence approach and instead "signifies that given the great magnitude of the risk, the balancing approach imposes on the actor an obligation of great precautions"), 40(b) (AM. LAW. INST. 2012) ("Special relationships giving rise to [a special duty] . . . include[s] . . . a common carrier with its passengers."); RESTATEMENT (SECOND) OF TORTS §§ 314A (AM. LAW. INST. 1965) (stating that common carriers have a duty to take reasonable actions to protect passengers from unreasonable risks of harm) & cmt. e (stating that even with special relationships and affirmative duties, "[t]he duty in each case is only one to exercise reasonable care under the circumstances"), 283 cmt. c. ("The [reasonable-person] standard provides sufficient flexibility, and leeway, to permit due allowance to be made . . . for all of the particular circumstances of the case which may reasonably affect the conduct required."); *but see* RESTATEMENT (THIRD) OF TORTS: PHYS. & EMOT. HARM § 7(b) (AM. LAW. INST. 2010) ("In exceptional cases, . . . a court may decide that the defendant has no duty or that the ordinary duty of reasonable care requires modification."); Leon Green, *The Negligence Issue*, 37 YALE L.J. 1029, 1036–40 (1928) (arguing that the "ordinary prudent person" standard "enables the jury to pass judgment on the party's conduct in the light of the sort of person that party *is*").

Meck contends, however, that these states' courts have "wavered" on their holdings,[11] and

notes that most states still follow the common-law rule.[12] Texas courts have imposed the higher

[11] *See Bingham v. N.Y.C. Transit Auth.*, 864 N.E.2d 49, 51–52 (N.Y. 2007) (stating that common carriers are subject to a non-delegable duty of reasonable care to protect passengers, by maintenance or warning, who use a stairway not owned by the Transit Authority to access the subway); *compare Wash. Metro. Area Transit Auth. v. Jeanty*, 718 A.2d 172, 180 (D.C. 1998) (Terry, A.J., concurring) ("I write separately, however, to emphasize that [the majority] opinion should not be read as imposing on a common carrier a standard of care different from or greater than the duty that rests on any other defendant in a negligence case.") *with Wash. Metro. Area Transit Auth. v. Seymour*, 874 A.2d 973, 977 (Md. 2005) (stating that Maryland applies a higher standard of care to the same D.C. area transit authority).

[12] *See, e.g.*, *McElroy v. Cont'l Tenn. Lines, Inc.*, 367 So. 2d 954, 956 (Ala. 1979) ("It is the duty of common carriers of passengers . . . to exercise the highest degree of care.") (citing *Ala. Power Co. v. Hall*, 103 So. 867, 869 (Ala. 1925); *Mobile Light & R.R. Co. v. Therrell*, 88 So. 677, 678 (Ala. 1921)); *Gomez v. Superior Court*, 113 P.3d 41, 44 (Cal. 2005) ("[A] carrier of persons for reward, as was true at common law, is subject to a heightened duty."); *Thomason v. Miami Transit Co.*, 100 So. 2d 620, 621 (Fla. 1958) (applying "the high degree of care imposed upon a common carrier"); *Metro. Atlanta Rapid Transit Auth. v. Rouse*, 612 S.E.2d 308, 308 (Ga. 2005) ("A carrier of passengers, such as MARTA, must use extraordinary diligence to protect the lives and persons of its passengers.") (citing GA. CODE § 46–9–132; *Sparks v. Metro. Atlanta Rapid Transit Auth.*, 478 S.E.2d 923, 925 (Ga. Ct. App. 1996); *Millar Elevator Serv. Co. v. O'Shields*, 475 S.E.2d 188, 191 (Ga. Ct. App. 1996)); *Wright v. Midwest Old Settlers & Threshers Ass'n*, 556 N.W.2d 808, 811 (Iowa 1996) ("A common carrier must generally exercise more than ordinary diligence for its passengers' protection.") (citing *Rozmajzl v. Northland Greyhound Lines*, 49 N.W.2d 501, 504 (Iowa 1951)); *Davis v. Owen*, 368 So. 2d 1052, 1055 (La. 1979) ("Because plaintiffs were fare-paying passengers on a public conveyance and were injured, defendant NOPSI had the burden of proving that it was without the slightest degree of negligence.") (internal footnote omitted); *Mastriano v. Blyer*, 779 A.2d 951, 954 (Me. 2001) ("A common carrier owes its passengers a duty that requires 'the exercise of the highest degree of care compatible with the practical operation of the machine in which the conveyance was undertaken.'") (quoting *Roberts v. Yellow Cab Co.*, 240 A.2d 733, 735 (Me. 1968)); *Todd v. Mass Transit Admin.*, 816 A.2d 930, 934 (Md. 2003) ("A common carrier owes its passengers the highest degree of care to provide safe means and methods of transportation for them."); *Wash. Metro. Area Transit Auth. v. Reading*, 674 A.2d 44, 49 (Md. Ct. Spec. App. 1996) ("It is well established that a common carrier, such as WMATA, is obligated to use the highest degree of care that is consistent with its mode of transport to ensure the safety of its passengers.") (citing *Leatherwood Motor Coach Tours Corp. v. Nathan*, 579 A.2d 797, 799 (Md. Ct. Spec. App. 1990); *Mass Transit Admin. v. Miller*, 315 A.2d 772, 774 (Md. Ct. Spec. App. 1974)); *Sharpe v. Peter Pan Bus Lines, Inc.*, 519 N.E.2d 1341, 1343 (Mass. 1988) ("Because Peter Pan did not contest at trial that it was held to the high standard of a common carrier, we shall assess the evidence on that standard."); *Rogers v. W. Airline*, 602 P.2d 171, 175 (Mont. 1979) ("Because the airlines are air common carriers, they owe a high degree of care (some courts say the highest degree of care) to the safe passage of their passengers."); *Anderson v. Transit Auth. of City of Omaha*, 491 N.W.2d 311, 314 (Neb. 1992) ("[C]ommon carriers such as the defendant are required to exercise the utmost skill, diligence, and foresight consistent with the business in which they are engaged for the safety of their passengers and are liable for the slightest negligence proximately causing injury.") (citing *Pruitt v. Lincoln City Lines*, 22 N.W.2d 651, 653 (Neb. 1946)); *Sanchez v. Indep. Bus Co., Inc.*, 817 A.2d 318, 322 (N.J. Super. Ct. App. Div. 2003) ("As a common carrier, Independent would owe a high degree of care for the safety of its passengers so as to avoid dangers that are known or reasonably anticipated."); *Jeffries v. Toledo Area Reg'l Transit Auth.*, No. L-03-1318, 2004 WL 1594957, at *2 (Ohio Ct. App. July 16, 2004) ("A common carrier owes the highest degree of care for the safety of its passengers consistent with the practical operation of its system.") (citing *Turner v. Toledo Area Reg'l Transit Auth.*, No. L-90-181, 1991 WL 1575, at *1 (Ohio Ct. App. Jan. 11, 1991)); *Jones v. Port Auth. of Allegheny Cty.*, 583 A.2d 512, 514 (Pa. Commw. Ct. 1990) ("All of the appellate courts of this Commonwealth have made clear that a common carrier owes the 'highest duty of care' to its passengers."); *Kelly v. R.I. Pub. Transit Auth.*, 740 A.2d

13

duty on common carriers since nearly its inception, and, unlike the New York and Arizona courts, have not found the higher negligence duty too strict. Further, Meck notes, we adopted the common carrier's higher duty because, whatever the particular circumstances may be, the relationship between a common carrier and its passengers and the risks inherent in the services the carrier provides justify requiring common carriers to act not just in an ordinarily prudent way, but in a very cautious, competent, and prudent manner. *See Speed Boat Leasing*, 124 S.W.3d at 212; *Hewitt*, 3 S.W. at 707; *Halloren*, 53 Tex. at 53. According to Meck, the ordinary-care duty does not reflect the non-ordinary risks the common law has long recognized that common carriers' passengers face.[13]

Whatever inclination we may have to reconsider 165 years of common law as VIA requests, we decline that invitation in this case because applying the ordinary negligence duty would not change the outcome under these facts. While VIA's witnesses would not agree that a higher duty applies, they did agree that the applicable standard of care required VIA's operators to act in the specific ways that Meck argued the higher duty requires. Tremel Brown, who oversees VIA's safety and training departments, agreed that VIA expects its operators to avoid "hard stops," to use their interior mirror to check the back door, to apply the foot brake at all times when passengers are boarding or alighting, to be alert for those who might have missed the bus, to

---

1243, 1247 (R.I. 1999) ("When she entered the turnaround area that was subject to the control of RIPTA, she became a passenger for all practical purposes to whom the highest degree of care was owed.").

[13] VIA counters that "technological advances and intense governmental regulation" have assuaged any extraordinary risks that may have countenanced the higher duty when it was originally applied. *Bethel*, 703 N.E.2d at 1216. Although that may be true, no evidence in this record supports that conclusion. To the contrary, the undisputed evidence here established that VIA operates hundreds of buses carrying millions of passengers who do not wear seatbelts and are often standing, including "more vulnerable" people. It also established, at least sufficiently for the jury to conclude, that making an "abrupt stop" when traveling five miles per hour can cause those passengers to fall forward and sustain a neck injury requiring surgery.

14

maintain a speed that will permit a stop "with normal application of the brakes," to avoid distractions and remain focused on the road and their vehicle's surroundings, and to always start and stop the bus smoothly to avoid injuring passengers who may be moving about. And Wanda Scott, VIA's line instructor who was supervising Robertson, agreed that VIA's buses are much larger than most other vehicles around them, that its passengers—including the elderly, children, people with disabilities, and others who are "more vulnerable than the general public"—do not wear seatbelts and are often standing when the bus is moving, and that the public relies on VIA's operators to "be extremely safe in the operation of the bus."

While denying that a higher duty applied, VIA's witnesses conceded that VIA should have performed the very acts Meck argued the higher duty requires. Even if the trial court had instructed the jury to apply the ordinary negligence duty, the evidence supported the jury's finding that VIA failed to act in the ways VIA's own witnesses agreed it should have acted. While we have the authority to make the policy choice to alter the common law as VIA requests, we decline to consider that option when the decision would not affect the outcome in this case.

### III.
### Governmental Immunity

We now turn to VIA's governmental-immunity argument. Because VIA is a governmental entity that performs only governmental functions, governmental immunity bars Meck's claim unless the legislature has clearly and unambiguously waived that immunity. *See* TEX. GOV'T CODE § 311.034; *Wasson Interests*, 489 S.W.3d at 432–33. Meck argues that section 101.021(1) of the Texas Tort Claims Act waives VIA's immunity. That section waives immunity against claims seeking to impose liability for personal injury "proximately caused by the wrongful act or omission or the negligence of [a governmental entity's] employee acting within his scope of employment if:

15

> (A)  [the personal injury] arises from the operation or use of a motor-driven vehicle . . . ; and
>
> (B)  the employee would be personally liable to the claimant according to Texas law.

TEX. CIV. PRAC. & REM. CODE § 101.021(1).

VIA argues that although this section waives immunity when plaintiffs assert ordinary negligence claims against government entities, it does not clearly and unambiguously waive immunity when liability is based on "slight negligence" under the higher duty. Noting that the statute refers only to "negligence"[14] and does not define that term, VIA argues that we must apply the term's common, ordinary meaning. *See Tex. State Bd. of Exam'rs of Marriage & Family Therapists v. Tex. Med. Ass'n*, 511 S.W.3d 28, 34–35 (Tex. 2017). VIA then points to Black's Law Dictionary, which distinguishes between "negligence" ("The failure to exercise the standard of care that a reasonably prudent person would have exercised in a similar situation.") and "slight negligence" ("The failure to exercise the great care of an extraordinarily prudent person . . . ; lack of great diligence."). *Negligence*, BLACK'S LAW DICTIONARY (10th ed. 2014). And VIA also notes that we have often explained that "negligence" means the failure to exercise ordinary care. *See, e.g.*, *20801, Inc. v. Parker*, 249 S.W.3d 392, 398 (Tex. 2008). According to VIA, if the legislature had wanted to waive immunity against claims asserting liability under the higher negligence duty, it would have referred to "slight negligence" and not just to "negligence."

---

[14] We note that the section actually refers to "the wrongful act or omission *or the* negligence" of the government employee, raising the issue of whether, even if the reference to "negligence" did not include negligence under the higher duty, the reference to a "wrongful act or omission" does. Because we conclude that the "negligence" reference includes "slight negligence" under the higher negligence duty, we need not decide this issue.

Meck notes, however, that Black's earlier versions define negligence to mean a "legal delinquency which results whenever a man fails to exhibit the care which he ought to exhibit, whether it be slight, ordinary or great." *See, e.g.*, *Negligence*, BLACK'S LAW DICTIONARY (5th ed. 1983). Meck asserts that we must apply the term's common, ordinary meaning as it existed when the legislature enacted section 101.021 in 1969, not a meaning that has developed since that time.

We agree with Meck. Just as the Tort Claims Act incorporates, but does not define, well-established common-law concepts like "proximate cause" and "tangible personal property," it also incorporates the common-law concept of "negligence." *See Sampson v. Univ. of Tex. at Austin*, 500 S.W.3d 380, 389 (Tex. 2016) (applying "definitions developed both under the Tort Claims Act and at common law"). And to determine the meaning of that concept, we must consider the term's original public meaning, that is, "the meaning which it had when [the statute was] enacted." *Taylor v. Firemen's & Policemen's Civil Serv. Comm'n of City of Lubbock*, 616 S.W.2d 187, 189 (Tex. 1981).[15]

As we have explained, the common law has long used the term "negligence" to refer to "three degrees or grades of negligence," including gross negligence, ordinary negligence, and slight negligence. *Hewitt*, 3 S.W. at 707; *see also Hill v. Tex., N.M. & Okla. Coaches, Inc.*, 272 S.W.2d 91, 92–93 (Tex. 1954) (holding that jury charge properly defined "negligence" by a common carrier by defining the high degree of care); *Pennsylvania Co. v. Roy*, 102 U.S. 451, 456 (1880) ("For the slightest negligence or fault in this regard, from which injury results to the

---

[15] *See Wis. Cent. Ltd. v. United States*, 138 S. Ct. 2067, 2074 (2018) ("[E]very statute's meaning is fixed at the time of enactment."); *MCI Telecomms. Corp. v. Am. Tel. & Tel. Co.*, 512 U.S. 218, 228 (1994) (stating that the time of enactment is "the most relevant time for determining a statutory term's meaning"); *Perrin v. United States*, 444 U.S. 37, 42 (1979) (stating the "fundamental canon of statutory construction" that words be "interpreted as taking their ordinary, contemporary, common meaning . . . at the time Congress enacted the statute").

passenger, the carrier is liable in damages."). Because the Tort Claims Act does not clearly abrogate the common law, we conclude that the Act's reference to "negligence" includes "slight negligence" when the common law imposes on the defendant a duty to exercise a high degree of care. *See Wasson Interests*, 489 S.W.3d at 437.[16]

We also note that section 101.021 waives immunity for negligence involving the use of a motor-driven vehicle if "the employee would be personally liable to the claimant according to Texas law." TEX. CIV. PRAC. & REM. CODE § 101.021(1)(B). VIA concedes that, if Robertson had been driving for a privately operated common carrier, his personal liability would have been determined under the higher duty. VIA argues that Robertson cannot be personally liable for breaching that duty here, however, because as a VIA driver, he was necessarily performing a governmental function. But as we have explained, the fact that VIA (and Robertson, when acting within the scope of his VIA employment) only performs governmental functions simply means that governmental immunity applies, thus requiring us to look to the Tort Claims Act to determine whether it has waived that immunity.

Finally, VIA argues that if the legislature intended for section 101.021 to encompass more than ordinary negligence, it would have said so as it did in other subchapters of the Act. *See id.* §§ 101.055 (requiring "conscious indifference or reckless disregard" in emergencies), .058 (requiring the recreational use statute's "gross negligence" standard for landowner's liability). But under the common law, landowners and those responding to emergencies were subject to the ordinary-negligence duty. *See, e.g.*, *Mo., Kan. & Tex. Ry. Co. of Tex. v. Reynolds*, 122 S.W. 531,

---

[16] Although the statute's reference to "negligence" would also include the common-law concept of "gross negligence," the Tort Claims Act expressly provides that it "does not authorize exemplary damages." TEX. CIV. PRAC. & REM. CODE § 101.024.

532 (Tex. 1909) ("What the law requires is the exercise of the care to avoid injury which persons of ordinary prudence would use in such emergencies."); *City of El Paso v. Collins*, 440 S.W.3d 879, 885 (Tex. App.—El Paso 2013, no pet.) ("When a landowner gives permission to or invites another to enter the premises for recreation, [the recreational use statute] provides a different duty than the common law trespasser standard."). To subject them to a lower duty than the common law required, the legislature had to statutorily abrogate the common law, as it did. But it did not abrogate or alter the common-law duty applicable to common carriers.

We hold that the Tort Claims Act waives governmental immunity for the negligence of common carriers under the high-degree-of-care duty when that duty applies to them.

## IV.
### Evidence

Finally, VIA argues that no evidence supports the jury's finding that VIA breached any duty it owed to Meck. VIA argues that expert testimony was required to establish the standard of care and that the only experts who testified opined that VIA did not breach that standard. Evidence is considered legally insufficient to support a jury finding when "(1) the record discloses a complete absence of evidence of a vital fact; (2) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact; (3) the evidence offered to prove a vital fact is no more than a mere scintilla; or (4) the evidence establishes conclusively the opposite of a vital fact." *JBS Carriers, Inc. v. Washington*, 564 S.W.3d 830, 841–42 (Tex. 2018) (quoting *Gunn v. McCoy*, 554 S.W.3d 645, 658 (Tex. 2018)). We consider the evidence in the light most favorable to the verdict. *Id.* (quoting *Gunn*, 554 S.W.3d at 658).

We have never held that expert testimony is required to establish a common carrier's standard of care or to establish a carrier's breach of that standard. Other courts have expressly held

to the contrary. *See, e.g.*, *Garrett v. Am. Airlines, Inc.*, 332 F.2d 939, 943 (5th Cir. 1964) (holding that Texas negligence action against common carrier "was hardly the sort of case beyond the competence of the average juror requiring expert testimony"); *Maison*, 214 A.3d at 196 (holding that expert testimony was not necessary for jurors to understand duty owed by New Jersey transit authority). But even if expert testimony were required, we conclude that the evidence was sufficient to establish the standard in this case. As explained above, VIA's own witnesses agreed that the applicable standard required Robertson to avoid "abrupt stops," check the back door, apply the foot brake when passengers are boarding or alighting, maintain a speed that will permit stops "with normal application of the brakes," always start and stop the bus smoothly, and "be extremely safe in the operation of the bus."

This testimony was sufficient to establish the standard of care that Robertson owed to his passengers, and the fact that VIA's witnesses ultimately opined that Robertson did not breach that standard does not negate the evidence supporting the jury's finding that he did. The jury watched a CCTV video showing the incident from a number of different angles, which was played repeatedly during the trial. Meck testified that "it felt like the bus jerked right out from underneath me. And I mean you can see in the video at the end there, it almost lifts me off my feet." According to Meck, "the driver sped off and then immediately slammed on the brakes," and Meck "was flung forcefully toward the front of the bus and crashed into the wall behind the driver." And Wanda Scott, VIA's line instructor, admitted that she might have made "different decisions" than Robertson, that she probably would have gone through the intersection and stopped on the other side of the street to let the passenger out, and that she believed Robertson "could have handled the

stop better." This evidence was legally sufficient to permit the jury to conclude that VIA breached its duty to Meck.

## V.
## Conclusion

We conclude that VIA is a common carrier, that the Tort Claims Act waives VIA's governmental immunity against Meck's claim for breach of its duty to its passenger, and that legally sufficient evidence supports the jury's finding that VIA breached that duty. We therefore affirm the court of appeals' judgment.

_____
Jeffrey S. Boyd
Justice

Opinion delivered: June 26, 2020